AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the

### Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Blue iPhone 13 (Target Device 1), Red iPhone (Target Device 2),<br>Black Cloud Mobile Android phone (Target Device 3), and Black<br>iPhone (Target Device 4) | )<br>)<br>)<br>)<br>)<br>) Case No. **24MJ1514** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1591 | Sex Trafficking of a minor |

The application is based on these facts:

See Affidavit in Support of Search Warrant

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Aron Marcellus, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date:  **Apr 17, 2024**

_____
*Judge's signature*

City and state:  San Diego, California

Hon. Barbara L. Major, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Aron Marcellus, Special Agent with Homeland Security Investigations, being duly sworn, hereby state as follows:

### INTRODUCTION

1.      I make this affidavit in support of an application for a search warrant to search the following electronic devices, as described in Attachment A-1, A-2, A-3, and A-4 and seize evidence of crimes, specifically, violations of Title 18, United States Code, Sections 1591, as more particularly described in Attachment B:

a. Blue iPhone 13 in a blue case, FP&F# 2024250100040801-0003 (**Target Device 1**).

b. Red iPhone in a clear case, FP&F# 2024250100040801-0005 (**Target Device 2**).

c. Black Cloud Mobile Android phone, FP&F# 2024250100040801-0006 (**Target Device 3**).

d. Black iPhone, FP&F# 2024250100040801-0002 (**Target Device 4**). (Collectively, the "**Target Devices**"). This search supports an investigation conducted by the San Diego Human Trafficking Task Force (SDHTTF) into Tazhae Sanders (SANDERS) who is suspected of committing the crimes mentioned above. A factual explanation supporting probable cause follows.

2.      **Target Devices 1, 2, and 3** were seized from SANDERS' vehicle following his arrest for sex trafficking of a minor and the recovery of a fifteen-year-old juvenile female (JF) on April 11, 2024. **Target Device 4** was seized pursuant to California State search warrant (#2404111402-OTH-VNP-US-USW) executed on April 11, 2024, related to SANDERS' involvement in trafficking JF. The **Target Devices** are currently in the possession of the SDHTTF, located at

9425 Chesapeake Drive, San Diego, California, 92123, in the Southern District of California.

3. Based on the information below, there is probable cause to believe that a search of the **Target Devices** will produce evidence of the aforementioned crimes, as described in Attachments B.

4. The information set forth in this affidavit is based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not set forth each and every fact that I or others have learned during the course of this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

5. I am an investigator or law enforcement officer within the meaning of Title 8, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18 and 21 of the United States Code.

6. I am a Special Agent (SA) employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am a graduate of the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia and I have been employed as a SA since September 2017. I have been trained to conduct criminal investigations for multiple violations of federal and state laws including, but not limited to human smuggling and narcotics smuggling, human trafficking, weapons trafficking, and

organized criminal activity. I am currently assigned to the Border Enforcement Security Task Force (BEST), Human Smuggling/Trafficking Group specializing in a variety of criminal and financial investigations. My primary responsibilities include investigating human smuggling/trafficking and narcotics violations throughout San Diego County.

7.     Prior to being a SA with HSI, I was a Supervisory U.S. Border Patrol Agent (SBPA) with U.S. Customs and Border Protection (CBP) from April 2017 to September 2017 and a U.S. Border Patrol Agent (BPA) from February 2008 to March 2017. As a BPA I conducted law enforcement field operations, interviews, made arrests and prepared administrative and criminal cases related to the violation of immigration and narcotics laws.

8.     Since October 2019, I have been assigned to the SDHTTF where I have participated in investigations involving the exploitation of children and adults for illicit commercial sex activity, human trafficking, forced labor, various illegal activity of criminal gang members and have performed a variety of related investigative tasks.

9.     My experience as an HSI SA has included the investigation of cases involving the use of computers and the internet to commit crimes. I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer evidence seizure and processing, and various other criminal laws and procedures.

10.     Through my training, experience, and consultation with other law enforcement officers, I have learned that:

a.     Individuals involved in illicit commercial sex maintain records, including electronic files, related to their illicit business on computers and

3

computer servers hosting internet applications such as electronic mail (email) and personal social networking web pages;

   b.   Individuals involved in illicit commercial sex often solicit clients through electronic advertisements and other media, such as Craigslist, MegaPersonals, Skipthegames, and other social media sites accessed on cellular telephones and computers;

   c.   Individuals involved in illicit commercial sex maintain records of correspondence relating to client contact information as well as travel and lodging arrangements involved in such illegal activity;

   d.   Individuals involved in illicit commercial sex maintain documents and files containing names of associates and/or coconspirators involved in prostitution;

   e.   Individuals involved in illicit commercial sex maintain financial records, bank statements, money orders, money order receipts, and cash that are evidence of payments made in conjunction with prostitution;

   f.   Individuals involved in illicit commercial sex use cellular telephones, tablet, desktop, removal hard drives and flash drives, and notebook computers and maintain these items on their person and/or in their residences and/or vehicles. Individuals involved in illicit commercial sex use cellular telephones, tablet, notebook computers, and removable storage media to increase their mobility, coordinate illicit activities, and to provide pimps and prostitutes with instant access to phone calls, voice messages, text messages, instant messaging (IM) and internet based correspondence. Individuals involved in illicit commercial sex will use multiple cellphones, tablets, notebook computers, and phone numbers in order to maintain contact with other pimps, prostitutes, complicit businesses, and clients. These electronic devices contain wire and electronic data concerning telephonic contact records, text messages, and electronic mail messages with co-conspirators

and clients, as well as telephone books containing contact information for co-conspirators and clients. Individuals involved in illicit commercial sex also utilize digital cameras, cellular telephones, desktop and notebook computers with photograph and video capabilities to take photographs and videos of themselves as well as other coconspirators for the purpose of electronic advertising and promotion of prostitution. Moreover, I know that digital evidence can be stored on a variety of systems and storage devices including: hard disk drives, DVD ROMS, pagers, money chips, thumb drives, flash drives, and portable hard drives;

g. Individuals involved in illicit commercial sex use social media sites like Facebook or Instagram to find clients and prostitutes. They use Facebook messaging applications to communicate with prostitutes and customers to increase their mobility and coordinate illicit activities. Individuals involved in illicit commercial sex will often use multiple social media accounts in order to maintain contact with other pimps, prostitutes, complicit businesses, and clients. These social media accounts contain electronic data concerning instant messaging, electronic mail and social media addresses of co-conspirators and clients, including contact information for co-conspirators and clients. Individuals involved in illicit commercial sex also utilize social media to store and display, commonly known as posting, photographs, videos, and text of themselves as well as other co-conspirators for the purpose of electronic advertising and promotion of prostitution.

11. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, the evidence of illegal activity described above in paragraphs "a" through "g" is maintained by individuals involved in illicit commercial sex in property that they and their associates live in and operate as well as on online accounts including email accounts, which can be accessed on computers and cellular telephones.

## FACTS IN SUPPORT OF PROBABLE CAUSE

12.     On April 11, 2024, at about 0300 hours, San Diego Police Department (SDPD) received a 911 call from 15-year-old juvenile female (JF) stating that she was kidnapped and requesting officers to pick her up from the area of Dalbergia Street.[1] SDPD Officers responded to the area and located JF. JF's identity was confirmed, and she was found to be a missing juvenile from Los Angeles County. JF told officers that she was kidnapped by a male who she knew by the name "Jay." Jay and another adult female (AF), then drove her to San Diego for the purpose of prostitution. JF told officers she engaged in about eight prostitution encounters ("dates"). JF told officers her Instagram account is under the name of "y████l._". An officer located that account and found it to be public; the officer searched the account follower list and found an account "zae.the.daddy" that JF confirmed to belong to "Jay."

13.     As a result, SDPD Officers contacted the San Diego Human Trafficking Task Force (SDHTTF).  At about 0530 hours, SDHTTF Task Force Officer (TFO) M. Wiener and San Diego Sheriff's Detective M. Alcarion arrived at SDPD Central Substation to interview JF. The interview was audio recorded in its entirety, the below is a synopsis and was not disclosed chronologically but has been reorganized below for the ease of the reader.

## STATEMENT OF JF

14.     JF has been involved in commercial sex for about two years. She has had two prior pimp/traffickers and is familiar with the pimping and prostitution subculture. She stated she met a male subject who she referred to as "Jay" or "Zae" through another pimp in December 2023. She believed Jay's name to be "Jashawnte" or something that starts with a "T" and a last name of "Simmons" based on phone

---

[1] Based on my training and experience, I know Dalbergia Street to be the "blade" or public street used for the solicitation of prostitution.

calls she had overheard. JF stated his first name is hard to pronounce. She also knows him to be on probation in Los Angeles. She described him as a black male with a dark complexion, tall, skinny, and three shoulder length braids. He has "444" tattoo on his left hand. JF stated his Instagram is "Zae.the.daddy." JF stated Jay's girlfriend, AF, is pregnant with Jay's child. JF described her as a black female with a light complexion, about 220 pounds, short, with long black and green hair. JF stated AF has face tattoos to include some sort of money sign below her eye and a broken heart tattoo below the other eye; she also has a "444" tattoo on her hand. JF stated AF's Instagram is "shesopay." JF stated she doesn't know either of their phone numbers, but knows that Jay has an iPhone 13 that is purple in color with a black case. JF stated Jay drives a grey or brown Dodge Durango with a license plate that contained the letters "TUB."

15.   JF stated that on April 9th, she was at her foster home in Palmdale, California, when Jay requested to meet with her over the phone. She recalled hearing a female voice in the background and believed Jay or AF were going to assault her, but still agreed to meet. Jay and AF arrived at the foster home and told JF to get in their car, she did not want to get in the car and described that Jay placed his hand around the back of her neck while AF pushed her, both forcing her into the car. Initially Jay told her they were going to Lancaster to purchase marijuana; however, they drove to Los Angeles and subsequently San Diego. While driving, JF expressed wanting to go home because school resumed the following day; however, Jay told her to "shut up." JF knew they were going to San Diego because she saw the signs on the freeway. JF stated during the drive, AF tried to give her advice on her prostitution activities. At one point, while stopped and inside Jay's vehicle, she received a phone call on her phone, a black iPhone 12 in a green case, from her foster mom stored by her last name of "Pay." When Jay saw "Pay" was contacting her, he believed it to be another pimp, and assaulted her. JF described that Jay wrapped a

wet towel around his hand and began punching her with closed fists to the body, as well as kicking and stomping on her. JF stated at this time Jay took her iPhone and gave her the phone that was in her possession when contacted by law enforcement a black android Vortex. She stated she used this phone for prostitution purposes only. Jay had installed the Life360 application on to track JF's whereabouts, and disabled the ability to download any other applications so that JF could not log into social media or similar.

16.    JF stated the three arrived in San Diego around 0100 hours on April 10th and rented a room in AF's name at a Motel 6. Based on her description TFO Wiener showed her a satellite image of the Motel 6 located at 745 E Street in Chula Vista, in San Diego County. JF confirmed she was at the hotel, and using street view she identified room 302 as the room they stayed in. After renting the room, Jay dropped off JF at the blade (Dalbergia Street) to engage in commercial sex. JF estimated engaging in eight dates during this time. JF knew this, as Jay gave her three packs of condoms each containing three condoms. JF used all but one condom. JF stated most her dates were from the blade and the sex buyer would drive her to the hotel for the date. JF stated Jay also posted commercial sex ads of her on SkiptheGames and Megapersonals.[2]  JF stated Jay already had accounts for both sites and used his account to post her ad. JF stated the photos in the ads were taken by her on his phone and he then uploaded the photos to her ad. JF stated Jay listed his TextNow[3] number in the ad. JF stated Jay would text with the sex buyers himself to coordinate the dates and she would talk with them via phone or video call as needed. JF estimated having completed two commercial sex dates from the online ads. All of her prostitution earnings were collected by Jay.

[2] Based on my training and experience, I know the websites skipthegames and MegaPersonals to primarily be used for the advertisement of prostitution.
[3] Based on my training and experience, I know TextNow to be an application used to generate anonymous phonelines and commonly used in prostitution ads.

17.    While at the Motel 6, JF stated her prior pimp, "Tiny," called her through Instagram. As a result, Jay again assaulted JF. JF stated Jay struck her with the hotel phone and then slammed her into the shower, breaking the shower nozzle. JF stated Jay also struck her with a wire hangar. She stated that as a result of the assault, she was bleeding from her nose and eye. While speaking with JF, TFO Wiener could see her right eye was noticeably bruised and swollen. During this assault, JF stated AF also hit her and spit on her. JF stated she was yelling loudly during this time and remembered someone knocking on the door. After the assault, Jay told her to shower and put on a hooded sweater. The three left the hotel and returned to the blade. JF stated they stopped at a Shell gas station near Dalbergia Street and were contacted by police. She stated the police talked to Jay and AF but not her.

18.    JF stated afterward the three went to the beach and used JF's prostitution proceeds to purchase marijuana. Afterward, the three returned to the blade where AF tried to recruit other prostitutes by calling out to them. The three continued on to another hotel that JF stated is near Market Street and Taco Bell. Based on her description, TFO Wiener showed her a satellite image of the Lodge at 32nd Street, located at 740 32nd Street in the city and county of San Diego. JF confirmed that to be the hotel they checked into on April 10th and identified their room to be room #1. While at this hotel, JF stated she completed one date. JF stated that while at this hotel, Jay took her phone from her again and also threatened her with a handgun that she described as black and semi-automatic. JF stated Jay planned to take her back to the blade this morning (April 11th) without the phone, but she was able to take the phone back unbeknownst to Jay. However, in the meantime Jay deleted all communications between the two. JF later consented to a search of her phone and TFO Wiener confirmed there were no text messages, phone calls, or photos linking the two in her phone.

9

19.     On April 11th, at about 0230 hours, Jay took JF back to the blade to engage in commercial sex. After being dropped off, JF called 911.

20.     JF clarified that both Jay and AF knew her to be a minor at the time of these offenses. JF told them she had to get back school and they picked her up from her foster home.

21.     After the interview with JF, TFO Wiener took several photographs of her injuries to include bruising and swelling around her right eye, bruising and swelling behind her right ear, bruising on both arms and legs, and a bruise that appears to be consistent with JF's report that she was struck with a wire hangar.

22.     During her interview, JF described the vehicle used by Jay and AF. Det. Alcarion drove to the Lodge on 32nd Motel and located Jay's vehicle.  He sent a picture of the vehicle and TFO Wiener showed it to JF. She stated that it appears to be the same vehicle. Additionally, Det. Alcarion obtained the registry for room #1 at the Lodge at 32nd. The room was rented April 10, 2024, to April 11, 2024, to AF. Det. Alcarion showed hotel staff a photo of JF, and they identified her as being an occupant of room #1 with AF and another male; the Vehicle was also associated to the room. Det. Alcarion set up surveillance on the vehicle. At around 0840 hours, Det. Alcarion saw a male and female subject leave room #1 and enter the vehicle. Det. Alcarion followed the vehicle to the area of interstate 5 and Civic Center drove before losing sight of it.  However, SDHTTF TFO L. Durbin located the vehicle on Roosevelt Avenue in National City and subsequently on Dalbergia Street. TFO's followed the vehicle to the Chevron gas station located at 3774 Main Street in the city and county of San Diego. TFO Wiener requested a marked SDPD unit to make a traffic stop on the vehicle as there is probable cause to arrest for violations related to 236.1(c)(2) PC, Human Trafficking of a Minor with Force.

23.     The driver of the vehicle was identified as SANDERS by his CA DL Y8848361. Based on JF's description and statement, TFO Wiener believe this to be

Jay. The passenger of the vehicle was identified as AF and TFO Wiener believe this to be AF. Both were arrested and transported to SDPD Central substation for processing. The vehicle was towed incident to SANDERS' arrest. An inventory search was conducted, and TFOs' located four cellphones (to include **Target Devices 1, 2, and 3**), risqué clothing, a keycard for the Lodge at 32nd, and a keycard for Motel 6; a handgun was not located. The four cellphones and hotel keycards were seized as evidence. **Target Device 1** was located between the driver's seat and center console; SANDERS later identified this device to be his. **Target Device 2** was located in the glove box; SANDERS later identified this device to be his. **Target Device 3** was located on the center console; SANDERS later stated he thinks the device belongs to AF. The fourth phone AF later identified as hers and gave written consent to search the contents.

24.     After the arrest, TFO Wiener told JF that SANDERS and AF had been arrested. JF appeared very nervous at learning this. JF was later shown a photo of SANDERS and AF and stated those individuals are not Jay and AF. However, based on surveillance, hotel staff statements, and JF's descriptions of Jay and AF matching those of SANDERS and AF, TFO Wiener believe her to be lying about their identity to protect them, a common theme with trafficking victims out of fear of retaliation or violating the rules of the pimping and prostitution subculture.

25.     Sheriff Det. C. Kombo went to the Chula Vista Motel 6 and confirmed with hotel staff that JF was there with SANDERS and AF. Hotel staff also confirmed reports of a physical altercation that occurred in the room.

26.     In a post-*Miranda* interview with AF, she confirmed that she and SANDERS were in fact with JF.  AF also reported SANDERS had violently trafficked her as well. AF stated that she was with SANDERS when they picked up JF and described that she heard SANDERS verbally tell JF to get into the car. AF recalls the child locks on the door to be engaged, to prevent JF from exiting the car.

11

AF stated that while JF was on dates, she and SANDERS would wait in the car during JF's dates and after JF would bring the proceeds to SANDERS. AF stated she witnessed SANDERS assaulting JF, and independently described the assault to include hitting JF with the hotel phone and striking her with a wet towel. AF consented to a search of her phone; a preliminary search of AF's phone revealed messages consistent with SANDERS conspiring to traffic JF.

27.    On April 11, 2024, the honorable Judge Pippins signed search warrant #2404111402-OTH-VNP-US-USW authorizing the search of room #1 of the Lodge hotel. The warrant was executed at about 1600 hours. Inside the room TFO Wiener located $310.00 in US currency and a black iPhone (**Target Device** 4) in a backpack containing identifying documents for SANDERS. There were also several used condoms in the trashcan. A handgun was not located in the hotel room.

**PROCEDURES FOR ELECTRONICALLY STORED INFORMATION AS TO ANY CELLULAR TELEPHONE**

28.    It is not possible to determine, merely by knowing the mobile electronic device's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Mobile electronic devices, including cellular telephones and tablets, can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers and installable software now allow for their subscribers and users to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many mobile electronic devices do not

have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some mobile electronic device models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

29. Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the **Target Devices** and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

30. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

**GENUINE RISK OF DESTRUCTION OF DATA**

31. Based upon my experience and training, and the experience and training of other law enforcement agents with whom I have communicated, electronically stored data may be permanently deleted or modified by users possessing basic computer skills. In this case, no genuine risk of destruction exists as the property to be searched is already in the custody of law enforcement personnel.

## PRIOR ATTEMPTS TO OBTAIN DATA

32.     No prior attempts have been made by law enforcement to attempt to obtain data from the **Target Devices** or accounts.

## CONCLUSION

33.     Based on the foregoing, I believe there is probable cause to believe items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, 18 U.S.C. §§ 1591 as described in Attachments B will be found in the properties to be searched, as provided in Attachment A.

_____
Aron Marcellus, Special Agent
Homeland Security Investigations


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this _____ day of April 2024.
**Apr 17, 2024**


_____
HONORABLE BARBARA L. MAJOR
United States Magistrate Judge

14

# ATTACHMENT A

## ITEM TO BE SEARCHED

The property/items to be searched is described as follows:

1. Blue iPhone 13 in a blue case
   FP&F# 2024250100040801-0003
   **(Target Device 1)**

2. Red iPhone in a clear case
   FP&F# 2024250100040801-0005
   **(Target Device 2)**

3. Black Cloud Mobile Android phone
   FP&F# 2024250100040801-0006
   **(Target Device 3)**

4. Black iPhone
   FP&F# 2024250100040801-0002
   **(Target Device 4)**

**Target Device 1, 2, 3 and 4** are currently being held at the San Diego Human Trafficking Task Force, located at 9425 Chesapeake Drive, San Diego, CA, 92123, in the Southern District of California.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the **Target Devices** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones. The seizure and search of the cellular telephones will be conducted in accordance with the "PROCEDURES FOR ELECTRONICALLY STORED INFORMATION AS TO ANY CELLULAR TELEPHONE" as specified in the affidavit. The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, photographs, audio files, video, telephone numbers, contact information, web browsing history, documents, data stored within applications, and location data, for the period of April 12, 2023, up to and including April 12, 2024:

    a.    tending to indicate efforts to recruit, entice, harbor, transport, provide, obtain, or maintain a person for the purposes of engaging in a commercial sex act;

    b.    tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate human trafficking;

    c.    tending to identify co-conspirators, criminal associates, or others involved in human trafficking;

    d.    tending to identify funding sources, bank accounts, and financing methods involved in human trafficking;

    e.    tending to show efforts to solicit commercial sex acts on websites including but not limited to MegaPersonals and SkiptheGames;

    f.    tending to identify travel to or presence at locations used for commercial sex acts;

g.    tending to identify the user of, or persons with control over or access to, the subject phone; and/or

h.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**which are evidence of violations of Title 18, United States Code, Section 1591.**

17